UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

Case No 8:20-cv-02453-VMC-AAS

MIKE BRINKMAN,

        Plaintiff,

vs.

HEALTHCARE REVENUE
RECOVERY GROUP, LLC
d/b/a ARS ACCOUNT
RESOLUTION SERVICES,

        Defendant.

_____/

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT WITH SUPPORTING MEMORANDUM OF LAW AND INCORPORATED STATEMENT OF MATERIAL FACTS

COMES NOW Defendant, Healthcare Revenue Recovery Group, LLC d/b/a ARS Account Resolution Services ("ARS"), by and through its undersigned counsel, and files this Motion for Summary Judgment with Supporting Memorandum of Law and Incorporated Statement of Material Facts against Plaintiff, Michael Brinkman, ("Brinkman"), pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1, and in support thereof states as follows:

## STATEMENT OF MATERIAL FACTS

On July 25, 2017, Plaintiff, Michael Brinkman sought medical treatment and services at Tampa General Hospital. ("TGH") **[Vetrano Depo, Ex.4]** As a part of the medical treatment, medical services were provided by Inphynet Contracting Services ("Inphynet") which hires the ER physician services for Tampa General Hospital. **[Ex.4]** On November 6, 2017, Inphynet received a partial payment from AdventHealth Advantage Plan in the amount of $306.42 towards the total balance of $3,118.00. [**Ex.4, p. 18, 5-13**] Inphynet sent out a second statement to Brinkman regarding the remaining balance of $2,811.58 but received no reply from Brinkman. [**Ex.4, p. 18, 14-18**]   The remaining balance was placed with ARS on February 3, 2018, to collect the balance. **[Ex.4, p. 18, 19-20]**   Health First was serving as a third-party administrator for AdventHealth which caused confusion and error in determining network participation for Inphynet. **[Ex.4, p. 19, 13-17]**   Inphynet did not have a contract loaded in its computer billing system for Health First. [**Ex.4, p. 20, 8-15**]   Inphynet did not become aware of the billing error until May 7, 2020. **[Ex.4, p. 21, 19-24]** On November 18, 2018,  the Brinkman account was placed with ARS for collections **[Collection Notes, Ex. 1, p. 1]**   On November 22, 2018,   ARS sent Brinkman its required Collection Notice pursuant to the FDCPA, Section 1692g.  **[Ex. 1, p. 7]** From December 3, 2018, until February 2020, ARS attempted to reach Brinkman via telephone without success. **[Ex. 1, pp. 7-10]**   A follow-up letter was mailed to Brinkman on January 5, 2019.

**[Ex. 1, p. 7]** A settlement letter was mailed to Brinkman on July 24, 2019.

**[Ex. 1, p. 9]** On February 20, 2020, Brinkman executed a Uniform Residential Loan Application agreeing to an interest rate of 3.99 percent (3.99%) with Guaranteed Rate. **[Loan Application, Ex 2]**

Brinkman initiated five (5) Automated Consumer Dispute Verifications ("ACDV" from February 16, 2020, to February 24, 2020. **[4 ACDVs, Composite Ex. 3]** On February 16, 2020, ARS received a TransUnion ACDV labeled as dispute code 001. **[Ex. 3-1]** This code stated "[n]ot his/hers. Provide or confirm complete ID". Plaintiff included the following text: *"I've never had a delinquent payment in my life. This is some sort of error on the vendor's (sic) part."* **[Ex. 3-1]** The ACDV provided no additional information and no documentation to assist in the specific dispute. **[Ex. 3-1]** The free-form narrative provided by Brinkman failed to indicate any specific error or direction as to the nature of the actual dispute. **[Ex. 3-1]** On February 18, 2020, ARS received two identical ACDVs, one from TransUnion and one from Equifax labeled code 012 which stated, *"[c]laims paid the original creditor before collection status/paid before charge off. Verify account status, payment rating, current balance, amount past due and account history".* **[Ex 3-2; 3-3]** Both ACDVs contained no additional information relating to the specific nature of the dispute, no free-form statement by Brinkman, and no attached documentation. **[Ex. 3-2; 3-3]** On February 24, 2020, ARS received another

Equifax ACDV labeled dispute code 013 which stated *"[d]isputes current balance and/or amount past due. Verify current balance or amount past due."* **[Ex. 3-4]**  The ACDV has a written narrative from Brinkman which stated *"I have documentation (attached) to confirm that the account was paid in full for the period in question."* **[Ex. 3-4]**  Finally, on February 28, 2020, ARS received an ACDV from Experian with a dispute code of 112 which stated *"claims inaccurate balance information, [d]id not provide specific dispute. Provide complete ID and verify account information."* **[Ex. 3-5]** Given the fact that no additional explanation or documentation was provided to identify a specific issue related to the dispute, this ACDV was reviewed by ARS's computer software program Sonnet Two which handles specific dispute requests that only require a comparison of account information within its system to the data reflected on Brinkman's report. **[Brennan, 8/19/20 Depo. p. 13, line 21 through p. 24 line 24]**  All responses to the ACDVs were verified as accurate and the account based on the dispute codes and any information provided by the CRA or Brinkman. **[Ex. 3-1 through 3-5]**  Each account was also marked with an XB[1] status code. **[Ex. 3-1 through 3-5]**  On March 19, 2020, ARS received a telephone call from Kyra Weiss who represents Health First. **[Weiss Transcript, Ex, 5]** During the telephone call,  Ms. Weiss claimed for

---

[1] An XB code is designed to notify the CRA that the debt obligation is disputed and to suppress the account from the calculation of any credit scoring. **[Ulzheimer Report Ex. 7, p. 11]**

the first time to ARS that Brinkman's account was subject to an in-network charge and not an out-of-network charge. **[Ex. 5, p. 3; Ex. 1, p. 8]** The ARS representative requested that Ms. Weiss send a copy of the EOB and ARS would send it to Inphynet for review and consideration. **[Ex. 5, p. 3; Ex. 1, p. 8]** During mid-March, April, and May 2020, the State of Florida was under a "shelter-in-place" order which caused disruption to normal business operations within the state. **[COVID Order, Ex. 6]** On March 31, 2020, ARS provided a copy of the EOB to Inphynet for review. **[Ex. 1, p. 11]** On May 4, 2020, ARS again sent a copy of the EOB to Inphynet for follow-up on the status of the review. **[Ex.1, p. 11]** On May 7, 2020, ARS was instructed by Inphynet to "[h]onor the request of the EOB and close this one out. If this is on the patient's credit, please have it removed." **[Ex 1, p. 11]** On May 7, 2020, ARS placed the account for a deletion request. **[Ex. 1, p. 11]** On May 28, 2020, Brinkman called ARS for a status of the account, and he was advised that the account was closed and the credit item will be removed. **[Ex.1, p. 12]** On June 4, 2020, an additional AUD was submitted to each CRA to expedite the removal of the account. **[Ex.1, p. 12]** ARS did not initiate any collection communications to Brinkman after February 13, 2020. **[Ex. 1, p. 8]**

## MEMORANDUM OF LAW

Under Section 1681s-2(b) of the FCRA, the plaintiff bears the burden of proving that an investigation into a dispute was not reasonable. *Arianas v.*

*LVNV Funding LLC*, 132 F. Supp. 3d 1322, 1327 (M.D. Fla. 2015). "A furnisher of information is entitled to summary judgment if it conducts a reasonable investigation based upon the information regarding the dispute provided by the credit reporting agency, concludes that there is no evidence its information is inaccurate, and accurately reports its findings to the credit reporting agencies." *Stroud v. Bank of Am.*, 886 F. Supp. 2d 1308, 1313 (S.D. Fla. 2012).

Plaintiff has failed to create any genuine issue as to the unreasonableness of ARS's investigation to the credit reporting agencies ("CRAs"). Plaintiff's allegations against ARS contend that ARS either knew or should have known that the underlying medical debt obligation was not owed by Brinkman.  However, it is undisputed that it was later discovered that the original creditor, Inphynet Contracting Services, LLC ("Inphynet") erred in considering the debt obligation as an out-of-network charge according to his healthcare insurance carrier. Contrary to Brinkman's allegations, it is undisputed that until May 7, 2020, Inphynet continued to represent and verify that the underlying debt obligation sent to ARS for collection was due and owing as an "out-of-network" service. **[Ex.4, pp. 18-21]**  In addition to the creditor's error, Plaintiff failed to provide sufficient and specific information with supporting documentation to aid in ARS's investigation. **[Ex. 3-1 through 3-5]** As such, ARS asserts that it did not violate the FCRA either negligently or willfully as it is clear that the ACDVs provided only vague and

non-specific descriptions of the alleged dispute and that none of the ACDVs would have alerted ARS to an error that not even Inphynet knew about until May 7, 2020. **[Ex. 4, pp. 18-21]**

Essentially, 15 U.S.C. §1681s-2(b) requires a furnisher of information, such as ARS that receives a notice of dispute to conduct an investigation with respect to the disputed information it receives from the CRA, review all relevant information provided by the CRA, including the consumer's dispute letter if provided, and timely report the results of the investigation to the CRA. *15 U.S.C. §1681s-2(b)(1)(A)-(E).* For the reasons detailed below, none of Plaintiff's claims are supported by the undisputed record evidence and ARS is entitled to judgment in its favor as a matter of law.

## A.    ARS Conducted Reasonable Investigations

It is undisputed that in February 2020, Brinkman initiated five (5) re-investigation requests that were sent directly to ARS for review and investigation. **[Ex. 3-1 to 3-5]** The investigation of the February 18, 2020 ACDV from Equifax was conducted by ARS agent Nicholas Greaves who reviewed the account history, verified the balance as accurate, and coded the account as disputed by placing it in an XB status code. Based on the 012 Code description, ARS updated the disputed account information and updated additional information relating to the account. **[Greaves Depo, pp. 29-30]** The investigation of the February 24, 2020 ACDV from Equifax was conducted

by Lisabet Pardo-Estrada who also confirmed that the balance matched the account history in the system.  The ACDV indicates that no documents were attached to the file, however, it is asserted by Plaintiff that the request included a February 24, 2020 letter from TGH claiming a zero balance for its services.  It is undisputed that Inphynet is not a part of TGH, and its services are separate and distinct from those of TGH. Therefore, even if the letter was attached, it would be irrelevant as to whether Inphynet's services had been paid by Brinkman or anyone.

Brinkman generally claims that if ARS had "conducted a reasonable investigation, it should have discovered the inaccurate data". However, contrary to Brinkman's contention, "the reasonableness of an investigation is determined primarily from analyzing how specific or limited the notice was that the furnisher received from the CRA regarding the nature of the dispute." *Hills v. Specialized Loan Servicing*, 2021 U.S. Dist. LEXIS 131226 (M.D. Fla. March 25, 2021) (*citing*, *Chiang v. Verizon New Eng. Inc.*, 595 F.3d 26, 38 (1st Cir. 2010)) (citations omitted). Summary judgment is proper as to the reasonableness of an investigation if reasonableness or unreasonableness is beyond question. *Id. (citing Westra v. Credit Control of Pinellas*, 409 F.3d 825, 827 (7th Cir. 2005)(holding that furnisher's investigation was reasonable given the "scant information" provided to it)).  In *Hills*, the district court citing the Eleventh's Circuit's opinion  in *Felts v. Wells Fargo Bank, N.A.*, 893 F.3d 1305,

1312 (11th Cir. 2018) that:

> Regardless of the nature of the investigation a furnisher conducted, a plaintiff asserting a claim against a furnisher for failure to conduct a reasonable investigation cannot prevail on the claim without demonstrating that had the furnisher conducted a reasonable investigation, the result would have been different; i.e., that <u>the furnisher</u> would have discovered that the information it reported was inaccurate or incomplete, triggering the furnisher's obligation to correct the information. Absent that showing, a plaintiff's claim against a furnisher necessarily fails, as the plaintiff would be unable to demonstrate any injury from the allegedly deficient investigation.

*Felts,* 893 F.3d at 1313 (emphasis added).

The record however is devoid of any evidence that ARS could have come to a different outcome based on the limited and scant information provided by Brinkman in each of the re-investigation requests. *see also Hinkle v. Midland Credit Mgmt., Inc.,* 827 F.3d 1295, 1302 (11th Cir. 2016) (applying a "reasonableness" standard to investigations under section 1681s-2(b)). This standard is procedural and not substantive. *Arianas v. LVNV Funding LLC,* 132 F. Supp. 3d 1322, 1327 (M.D. Fla. 2015). Therefore, an investigation that is unfavorable to the consumer is not necessarily unreasonable, even if the results of the investigation turn out to be inaccurate. *Bauer v. Target Corp.,* 2013 U.S. Dist. LEXIS 201316, *14 (M.D. Fla. June 19, 2013) (slip copy). The question of reasonableness varies based on the individual circumstances of the case and depends in part on the status of the furnisher and <u>the quality of the available documentation</u>. *Hinkle,* 827 F.3d at 1302. It is the plaintiff's burden to prove that the investigation was not reasonable. *Stroud v. Bank of Am.,* 886

F. Supp. 2d 1308, 1314 (S.D. Fla. 2012). Plaintiff's Complaint alleges in Paragraph 39 that "[a] simple phone call to the medical provider would have confirmed that Plaintiff visited an "in-network" facility and therefore did not owe any money." However, the undisputed evidence clearly indicates that none of the ACDVs mentioned the specific nature of the "in-network" issue to ARS and clearly a simple call by Brinkman to Inphynet providing them with a specific description with proper documentation would have avoided this entire lawsuit against ARS. As the ACDVs listed above indicate, Brinkman submitted vague, non-specific information with no documentation to support the actual specific dispute or any direction to define the scope of the re-investigation requests through the online e-OSCAR system for review by ARS agents. ARS's Expert, John Ulzheimer explains in his expert report how the ACDV dispute codes are generated by the CRAs.

> When a consumer's dispute is received by the credit reporting agency they distill the dispute into a three-digit dispute code. These dispute codes assist the credit bureaus in communicating the type and nature of the dispute to the furnisher and guide (or limit) the investigative actions of the furnisher. For example, dispute code "001" refers to the situation where the "Consumer says [the account is] not his or hers, Provide or confirm complete ID." These dispute codes and other consumer information are then pre-populated on a form called an Automated Consumer Dispute Verification (ACDV) and sent to the furnisher via a web-based system called Online Solution for Complete and Accurate Reporting or "e-OSCAR." e-OSCAR allows documents sent by the consumer to the credit reporting agencies to be attached to the ACDV communication and sent to the furnisher of the information.

**[Ulzheimer Report Ex. 7, pp. 13-14]**

As indicated, ARS received a series of ACDVs from Brinkman that failed to contain any specific dispute nor provided any documents or information to determine the specific issue of the alleged error. Each of the following ACDVs only requests to verify account status or "current balance" or a claim similar that the account is not Brinkman. It is undisputed that none of the ACDVs or any additional information[2] provided by Brinkman mentioned any claim or dispute that there was an insurance billing error or that the debt was mischaracterized as an out-of-network charge. This was an Inphynet error that was unknown and undiscoverable by ARS without the specific assistance and review by Inphynet.

Based on the limited, vague, and woefully inadequate information and lack of documentation, there is no genuine dispute as to the reasonableness of ARS's investigation procedures. In each of the above re-investigation requests, the ARS agent reviewed the ACDV, the scope of the request and nature of the dispute and based on the evidence and information in the possession of ARS, verified the account data as accurate.

## B.    Inphynet's In-Network vs. Out of Network Error

---

[2] The only alleged document attached to an ACDV was a 'zero balance' letter from TGH, which was meaningless as the debt was owed to Inphynet Contracting Services - a separate and independent emergency physician's group that is unaffiliated with TGH in any way.

11

The preverbal "elephant in the room" for Brinkman is the testimony of the corporate representative from Inphynet, Anthony Vetrano, who provided a detailed explanation of the insurance billing error. Mr. Vetrano states:

> On 11/6, after -- and here was the problem, or part of the confusion. Again, we thought that the insurance coverage was under AdventHealth Advantage Plan. We had that contract loaded in our system. The problem is -- or the confusion is that we received a payment from First Health, and it paid, I think, $306 and change, leaving what we thought was the balance of $2,811.58. And that's the amount that we sent a statement out on to Michael Brinkman on 11/6. And then, again, our second statement went out on May 25th of 2017, where we basically -- you know, it was our second statement, and we said if this amount is not paid, you know, we'll turn this over to collections. We received nothing, heard nothing, and that's when the next step was taken, we transferred the account to HRRG on February the 3rd of 2018.

Ex.4, p. 18,  Lines 5-20.

> Q: Okay.  So the payment, I guess, you're indicating -- and I'll share my screen to make sure that you can see it.  So I guess your explanation is, because the payment comes from Health First for the amount of $306.42, Inphynet did not believe that they were an in-network visit or -- walk me through that.
>
> A    That's exactly right.  We did not have a contract loaded in our system for Health First.

Ex.4, p. 20, Lines 8-15

> Q    Okay.  When did Inphynet become aware that Health First was, I guess, an agent for AdventHealth Advantage Plan?
>
> A    Yeah, I don't think that happened until May of 2020, when we were contacted by the insurance rep on 3/19 of 2020.

Ex.4, p. 21, Lines 19-24

None of these five (5) ACDVs, which are all created by the credit reporting agencies, adequately or specifically communicated the Plaintiff's actual intended dispute, which is that the subject debt existed due to an unknown, internal error by the original creditor's system not recognizing Brinkman's insurance carrier as an in-network medical service provider. None of the ACDV's contain sufficient information or direction to allow ARS to pinpoint the dispute and request verification of that issue during the review period for each of the ACDVs. None of the ACDVs suggested or could have reasonably been interpreted to mean as much. Clearly, ARS was not in possession of any information from February 16, 2020, to March 19, 2020, that indicated the source of the billing error: a computer entry issue by Inphynet that did not recognize Brinkman's insurance carrier as an "in-network" provider.

## C.   Direct Dispute and Continued Investigation

On March 19, 2020, Kyra Weiss, a representative from Health First, contacted ARS to advise them of the Brinkman insurance billing dispute. **[Ex. 5]** During that communication, ARS's representative continued the investigation by requesting a copy of the EOB (Explanation of Benefits"). **[Ex. 5]** Ms. Weiss was informed that upon receipt of the EOB, the information would be sent to Inphynet for its review and direction as to the status of the account. **[Ex. 5]** Despite some difficulty opening the electronic file,  ARS sent

the EOB to Inphynet for review and consideration on March 31, 2020.  **[Ex. 1, p. 11]**

Thus, it is undisputed that only Inphynet had the information and the investigative ability to review this issue and correct the problem on May 7, 2020. Once that information was discovered and verified by Inphynet, ARS was instructed to "*honor the EOB, close the account, and remove item from the credit bureau*" as indicated in the ARS collection notes for May 7, 2020. **[Ex. 1, p. 11]**

Whether an investigation is reasonable depends in large part on "the extent and detail of information the furnisher obtained from the [credit reporting agency] when the furnisher received notice of the dispute." *Bauer v. Target Corp*., 2013 U.S. Dist. LEXIS 201316, at *20.  The undisputed record here contains no evidence that ARS failed, either negligently or willfully, to reasonably investigate each of the ACDVs regarding the Brinkman Dispute, which only instructed ARS to verify Brinkman's identity, account balance, and accurately report its findings to the specific CRA.

Moreover, the procedure for responding to the ACDV that ARS received from each CRA was limited to ARS's use of the e-OSCAR platform, and the information provided by Brinkman or attached thereto. ARS could only review its own files and information available to ARS to investigate the ACDV regarding each dispute as ARS has never had any access to Inphynet's in-

14

network data file to separately and independently verify the actual issue or error. After conducting a reasonable investigation based on the information provided by the CRA and its own information, ARS correctly responded to the ACDV with its finding that the Brinkman account information was verified.

Although Section 1681s-2(b) obligates a furnisher to delete information found to be incomplete or inaccurate during its investigation and to modify, delete, or block disputed information that the furnisher cannot verify, *15 U.S.C. §1681s-2(b)(1)(E)*, ARS was not required to perform either action in response to each ACDV because its investigation did not identify any incomplete or inaccurate information. Rather, the investigation verified Brinkman's account within the parameters defined by the ACDV's code, and the information provided by Brinkman as a part of that ACDV. Accordingly, ARS fully complied with Section 1681s-2(b) and Plaintiff cannot satisfy his burden of proving that ARS's investigation of each ACDV was unreasonable.

The record evidence demonstrates that there is no genuine dispute that ARS complied with its duty to investigate each Brinkman ACDV. ARS is entitled to judgment in its favor as a matter of law.

### D.  No Willful Violation of Section 1681s-2(b)

Plaintiff's failure to produce any evidence of a negligent FCRA violation precludes a finding that ARS willfully violated the statute. "[I]n the context of civil liability under the FCRA, a willful violation includes an action that is 'not

15

only a violation under a reasonable reading of the statute's terms but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless.'" *Bauer v. Target Corp.*, 2013 U.S. Dist. LEXIS 201316, *11 (M.D. Fla. June 19, 2013) (*citing, Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 69 (2007)).

Additionally, damages for a willful violation of the FCRA "may be warranted . . . where an FCRA entity institutes a policy or performs an action in 'reckless disregard' of a consumer's rights under the FCRA." *Rambarran v. Bank of Amer., N.A.,* 609 F. Supp. 2d 1253, 1270 (S.D. Fla. 2009). Plaintiff has failed to meet this standard as he has not shown that ARS committed any violation at all in furnishing data to each CRA or in investigating any ACDV from each of these CRAs, much less took an action in "reckless disregard" of Plaintiff's rights or ran a risk of violation that was substantially greater than the risk run by a careless reading of the statute. *Rambarren,* 609 F. Supp. 2d at 1270; *Bauer*, 2013 U.S. Dist. LEXIS 201316 at *11. On the contrary, ARS's investigation of the ACDVs it received from each of the CRAs was objectively reasonable and there is absolutely no record evidence to support Plaintiff's claims that ARS "should have" discovered the allegedly inaccurate data in its investigation, or that ARS reported knowingly inaccurate information to any CRA.

Even if Plaintiff could prove that the investigation of each dispute was inaccurate, it would not support the claim of a willful violation in light of the substantial evidence that the investigation was procedurally reasonable. *See Bauer*, 2013 U.S. Dist. LEXIS 201316 at *14 (noting that an investigation result that turns out to be inaccurate does not render the investigation unreasonable). As Plaintiff has not identified any evidence to suggest that ARS either negligently or willfully failed to investigate Brinkman's account or that ARS's investigation of any of the five disputes was unreasonable, Plaintiff cannot establish entitlement to actual, statutory, or punitive damages under the FCRA and ARS is entitled to summary judgment on Plaintiff's FCRA claims.

## FCCPA: Section 559.72(9) Fla. Stat.

Count II of Plaintiff's Amended Complaint seeks damages under Florida's Consumer Collection Practices Act by alleging that ARS violated Section 559.72(9) *Fla. Stat*. The FCCPA prohibits any person, in collecting consumer debts, from "claim[ing], attempt[ing], or threaten[ing] to enforce a debt when such person *knows* that the debt is not legitimate or  assert[ing] the existence of some other legal right when such person *knows* that the right does not exist." Fla. Stat. § 559.72(9) (emphasis added)" See: *Bacelli v. MFP, Inc*. 729 F.Supp.2d 1328 (M.D. Fla. 2010). As the emphasis indicates, this provision "requires ***actual knowledge*** of the impropriety or overreach of a claim." *In re*

*Cooper,* 253 B.R. 286, 290 (Bankr. N.D. Fla. 2000) *(citing, Kaplan v. Assetcare, Inc.,* 88 F. Supp. 2d 1355, 1363 (S.D. Fla. 2000)). *Section 559.72(9) requires by its terms **actual knowledge**. In re Cooper,* 253 B.R. at 290*; see also In re Lamb,* 409 B.R. 534, 541 (Bkrtcy. N.D. Fla. 2009)*; Pollock v. Bay Area Credit Serv., LLC,* No. 08-61101-Civ, 2009 U.S. Dist. LEXIS 71169, 2009 WL 2475167, at *9 (S.D. Fla. Aug. 13, 2009)*; Williams v. Streeps Music Co., Inc., 333 So. 2d 65, 67 (Fla. 4th DCA 1976)* (striking allegation that a debt collector "should have known" the debt was not legitimate). ("*Section [559.72(9)*] requires by its terms *actual knowledge*.") (emphasis in original); *see LeBlanc v. Unifund CCR Partners,* 601 F.3d 1185, 1192 n.12 (11th Cir. 2010) (stating that *§ 559.72(9) of the FCCPA* requires the plaintiff to show the defendant "possessed <u>*actual knowledge*</u> that the threatened means of enforcing the debt was unavailable") (emphasis in original). ***Constructive knowledge is not sufficient*** " to prove a violation under Fla. Stat. §559.72(9). *McCorriston*, at 1279 (M.D. Fla. 2008) (emphasis added) (citation omitted). Under Fla. Stat. §559.72(9), "a plaintiff may not recover 'if the creditor merely should have known the debt was not legitimate.'" *Finster v. U.S. Bank Nat'l Ass'n*, 245 F. Supp. 3d 1304, 1318 (M.D. Fla. 2017), *aff'd,* 723 Fed. Appx. 877 (11th Cir. 2018) (citation omitted). Imputed knowledge is also insufficient to convey knowledge upon ARS.  See: *Bacelli,* 729 F. Supp. 2d at 1337 (M.D. Fla. 2010).

ARS possessed no actual knowledge that the underlying debt obligation was an in-network charge as discovered by the original creditor on May 7, 2020[3]. There is no evidence that ARS initiated or continued with collection activities on or after May 7, 2020. Secondly, the undisputed facts demonstrate that ARS had no actual knowledge that any aspect of the underlying debt obligation was "illegitimate" or that the creditor was seeking remedies under Florida law that do not exist. Florida law does not require ARS to become either a legal scholar in contractual matters in healthcare billing matters that are known only between carriers and healthcare providers. This section of the statute was designed as stated in the case *Read v. MFP, Inc.* 85 So.3d 1151 (Fla. 2nd DCA 2012) in which the Second District Court of Appeals in reviewing Section 559.72(9) stated:

> To show a violation of <u>section 559.72(9)</u>, "it must be shown that *a legal right that did not exist was asserted* and that the person had actual knowledge that the right did not exist." *Pollock v. Bay Area Credit Serv., LLC*, No. 08-61101-Civ, 2009 U.S. Dist. LEXIS 71169, 2009 WL 2475167, at *9 (S.D. Fla. Aug. 13, 2009) (emphasis added). Thus, for example, a plaintiff may establish a violation of section 559.72(9) by showing that the debt collector garnished wages in violation of the statutory requirements for garnishment, *see Cliff v. Payco Gen. Am. Credits, Inc.*, 363 F.3d 1113, 1124 (11th Cir. 2004), or actively attempted to collect a debt when the debt collector knew that the consumer had filed for bankruptcy protection, *cf. Bacelli v. MFP, Inc.*, 729 F. Supp. 2d 1328, 1337 (M.D. Fla. 2010), or attempted to collect post-judgment interest in an amount

---

[3] A review of the collection notes indicates that the account was transferred to ARS on November 21, 2018, and 82 collection calls and 5 letter attempts to communicate with Brinkman occurred from November 21, 2018, to March 12, 2020.

greater than the statutory rate, *cf. N. Star Capital Acquisitions, LLC v. Krig*, 611 F. Supp. 2d 1324, 1336-37 (M.D. Fla. 2009),. . . . In each of those cases, the debt collector asserted specific legal rights concerning the collection of the debt at issue when it did not legally possess those rights.

*Id.* at 8-9.

More importantly,  Plaintiff cannot point to any evidence that ARS had actual knowledge that the debt obligation, either in whole or in part, was illegitimate to warrant FCCPA liability upon ARS.  *See Finster*, 245 F. Supp. 3d 1304, 1318 (M.D. Fla. 2017) ("a plaintiff may not recover if the creditor merely should have known the debt was not legitimate."). Accordingly, ARS is entitled to summary judgment on Plaintiff's claim under Fla. Stat. § 559.72(9).

## **FCRA Preemption of Section 559.72(5) Fla. Stat.**

Plaintiff asserts credit bureau impact damages arising out of ARS's actions by reporting the alleged debt to the credit reporting agencies.  However, this claim is preempted by the federal Fair Credit Reporting Act ("FCRA"), which prohibits states from imposing any law regulating the responsibilities of persons furnishing information to credit reporting agencies.  *15 U.S.C. § 1681t(b)(1)(F)*. Plaintiff seeks alleged statutory and/or actual damages under Section 559.72(5) *Florida Statutes* arising from the transmission of information from a CRA.  However, this claim must fail since the alleged actions, even if true, are preempted by the federal Fair Credit Reporting Act ("FCRA").  The FCRA preempts state laws governing the responsibilities of

persons furnishing information to credit bureaus. Specifically, *section 15 U.S.C. § 1681t(b)(1)(F)* states, *"No requirement or prohibition may be imposed under the laws of any State . . . with respect to any subject matter regulated under . . . section 1681s-2 of this title, relating to the responsibilities of persons who furnish information to consumer reporting agencies. . . ." Section 1681s-2(a)(3)* obligates persons furnishing information to a consumer reporting agency to notify that agency if the consumer disputes the accuracy of the credit information being reported. Notably, the courts have recognized that *section 1681h(e)* of the FCRA creates an exception to this preemption provision for "false information furnished with malice or willful intent to injure [the consumer]." Importantly, however, this exception is expressly limited to "action[s] or proceeding[s] in the nature of defamation, invasion of privacy, or negligence. . .

A similar FCCPA issue was addressed in *Bauer*. The court in *Bauer* stated that "FCRA, 15 U.S.C. § 1681s–2, imposes affirmative duties on furnishers of credit information in order to assure the accuracy of a credit report." *Peart v. Shippie,* 345 F. App'x 384, 386 (11th Cir. 2011) (*citing, Cahlin v. Gen. Motors Acceptance Corp.,* 936 F.2d 1151, 1156 (11th Cir. 1991)). When a debtor disputes the completeness or accuracy of a credit report with a CRA, the CRA must promptly notify the furnisher of the dispute. *15 U.S .C. § 1681i(a)(2).* In the instant case, the Plaintiff has alleged that the Defendant

21

failed to comply with Section 559.72(9) *Florida Statutes,* namely resulting from ARS' communications regarding their disputed debts with the credit reporting agencies. The court in *Bauer* rejected this attempt to circumvent the FCRA by bringing identical claims under the FCCPA. As such, the court in *Bauer* stated "[a]ccordingly, the Plaintiff's FCCPA claims that the Defendant furnisher of information "report[ed] information concerning a debt known to be reasonably disputed by [Plaintiff] without disclosing that fact" to CRA Experian is limited to relief under the relevant portions of the FCRA only and are not actionable under Florida's corresponding state debt statute. *See Osborne v. Vericrest Fin., Inc.,* No. 8:11–cv–716–t–30TBM, 2011 WL 1878227, at *2–3 (M.D. Fla. May 17, 2011) ("Defendant's motion to dismiss based on preemption is granted to the extent that the FCCPA claim is premised on credit reporting activity."); *Menashi v. Am. Home Mortg. Servicing, Inc.,* No. 8–11–cv–1346–T–23EAJ, 2011 WL 4599816, at *2 (M.D. Fla. Oct.4, 2011); *Allmond v. Bank of America,* No. 3–07–cv–186–J–33JRK, 2008 WL 205320, at *7 (M.D. Fla. January 23, 2008) (citing *Knudson v. Wachovia Bank,* 513 F.Supp.2d 1255, 1259 (M.D.Ala.2007).

## No Punitive Damages Under the FCCPA

The FCCPA provides the plaintiff an opportunity to obtain punitive damages against the Defendant pursuant to Section 559.77(2) *Fla. Stat.* "To receive punitive damages on a FCCPA claim, the plaintiff must prove

defendant acted with malicious intent." *Arianas v. LVNV Funding LLC*, 307 F.R.D. 615, 619 (M.D. Fla. 2015) (citations omitted); *see also, Crespo v. Brachfeld Law Group*, 11-60569-CIV, 2011 WL 4527804, at *6 (S.D. Fla. Sept. 28, 2011) ("to obtain punitive damages for violation of the FCCPA, the plaintiff must establish that the defendant acted with malicious intent.") "Malicious intent requires 'evidence [of] a purpose to inflict insult and injury, or [acts which] are wholly without excuse.'" *Arianas* at 619 (citations omitted).

As discussed above, ARS was retained by the original creditor, Inphynet, to seek voluntary repayment of the self-payment portion of hospital charges from the Plaintiff. It is undisputed that the charges imposed on the Plaintiff were not known as an in-network charge until May 7, 2020; Inphynet admitted that they did not realize the error until May 7, 2020, and as a result informed ARS to discontinue collection and remove the item from the credit report. On that same date, ARS complied with this request. Accordingly, ARS is entitled to summary judgment on Plaintiff's claims for punitive damages under the FCCPA.

Finally, for the Plaintiff to maintain a claim for punitive damages against ARS, the Plaintiff must have a viable claim under the FCCPA. The Amended Complaint Count II is the only viable claim under the FCCPA that is asserted against ARS. Therefore, if the Court grants summary judgment in favor of ARS as to Count II, Plaintiff's claim for punitive damages is also

rendered moot. Even if the Court determines that a viable claim under the FCCPA survives summary judgment, Brinkman failed to prove any evidence to support a claim for punitive damages under the facts and circumstances of this case.

**Count III: FDCPA**

Plaintiff finally asserts that ARS violated Section 1692d and Section 1692f, which specifically address the nature of "collection behavior" which is characterized by Brinkman as either harassing, abusive or unconscionable. Given the undisputed factual circumstances and evidence supporting ARS's motion for summary judgment, nothing remotely reaches the context of "collection conduct" on the part of ARS, which was harassing, abusive or unconscionable. Clearly, ARS stands as the innocent messenger of an unknown billing error in Inphynet's billing software that accidentally mischaracterized Brickman's health insurance carrier as an out-of-network provider. Each ARS agent handled each inquiry and information related to Mr. Brinkman with consideration and a willingness to convey information to the original creditor to address a potential billing mistake. It should not go unrecognized that these events occurred at the beginning of the historic COVID-19 pandemic which forced all businesses to dramatically adjust workflows at a moment's notice.

**<u>CONCLUSION</u>**

Based on the foregoing, summary judgment should be granted in favor of ARS on Plaintiff's claims under the FCRA, FDCPA, and FCCPA as no evidence in the record creates a genuine dispute as to ARS's compliance with these consumer protection statutes. Plaintiff cannot establish that ARS negligently, much less willfully, failed to comply with its obligations under section 1681s-2(b). Further, ARS had no actual knowledge that the underlying debt obligation was "illegitimate" and thus is entitled to judgment as to Section 559.72(9) *Fla. Stat.* Similarly, ARS is entitled to judgment as a matter of law since Section 559.72(5) Fla. Stat. is preempted by the FCRA as it relates to credit reporting activities. Further, the undisputed facts do not demonstrate any conduct that would be characterized as "harassment" or "unconscionable behavior under the FDCPA.

Overall, it is clear from the facts and evidence in this case, that ARS's actions in handing Brinkman's vague and non-specific disputes and continuing to conduct follow-up investigations and reviews outside of the ACDV procedures demonstrates that the "process worked." It just did not work at the speed of Mr. Brinkman's expectations.

WHEREFORE Defendant, Healthcare Revenue Recovery Group, LLC d/b/a ARS Account Resolution Services, respectfully requests this Court GRANT its Motion and enter judgment in its favor on Plaintiff's Amended Complaint.

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing has been electronically filed on **August 25, 2021,** via the Court Clerk's CM/ECF system which will provide notice to all parties' counsel of record by operation of the Court's electronic filing system as indicated on the Notice of Electronic Filing. Parties may also access this filing through the Court's CM/ECF System.

*/s/ Ernest H. Kohlmyer, III*
Ernest H. Kohlmyer, III
Florida Bar No.: 110108
Skohlmyer@shepardfirm.com
Shepard, Smith, Kohlmyer & Hand, P.A.
2300 Maitland Center Parkway, Suite 100
Maitland, Florida 32751
Phone: (407) 622-1772
Fax: (407) 622-1884
*Attorneys for Defendant Healthcare*
*Revenue Recovery Group, LLC d/b/a*
*ARS Account Resolution Services*